IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES CARL POWELL,

                Petitioner,

    vs.

FRANK CHAVEZ, Warden, Sierra
Conservation Center,

                Respondent.

No. 2:11-cv-0422-JKS

MEMORANDUM DECISION

James Carl Powell, a state prisoner appearing *pro se*, filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  Powell is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the Sierra Conservation Center.  Respondent has answered.  Powell has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On March 5, 2007, a Solano County Superior Court jury convicted Powell of the following crimes: (1) from April 25, 2000, to April 25, 2001, continuous sexual abuse against a child under fourteen in violation of California Penal Code § 288.5(a); (2) between April 25, 2001, and April 25, 2002, oral copulation of a person under sixteen in violation of California Penal Code § 288a(b)(2); (3) between the April 25, 2001, and April 25, 2002, a lewd act upon a child of fourteen or fifteen years old and at least ten years younger than Powell in violation of California Penal Code § 288(c)(1); (4) between the April 25, 2001, and April 25, 2002, a lewd act upon a child of fourteen or fifteen years old and at least ten years younger than Powell in violation of California Penal Code § 288(c)(1); (5) between April 25, 2002, and April 25, 2003, oral copulation of a person under sixteen in violation of California Penal Code § 288a(b)(2);

(6) between April 25, 2002, and April 25, 2003, a lewd act upon a child fourteen or fifteen years old and at least ten years younger than Powell in violation of California Penal Code § 288(c)(1);

(7) between April 25, 2002, and April 25, 2003, a lewd act upon a child fourteen or fifteen years old and at least ten years younger than Powell in violation of California Penal Code § 288(c)(1);

(8) between April 25, 2003, and April 25, 2004, unlawful sexual intercourse with a minor in violation of California Penal Code § 261.5(c); (9) between April 25, 2001, and April 25, 2002, sending harmful matter to a minor in violation of California Penal Code § 288.2(a); and (10) between April 25, 2001, and April 25, 2004, furnishing controlled a substance (methamphetamine) to a minor in violation of California Health and Safety Code § 11380(a).

The Solano County jury also found true three special allegations, including: (1) the victim was particularly vulnerable; (2) the defendant induced a minor to commit or assist in the commission of a crime (count 10, using methamphetamine); and (3) the defendant took advantage of a position of trust. On March 6, 2008, the trial court sentenced Powell to a term of twenty-three years and four months. On March 19, 2010, the California Court of Appeal affirmed Powell's conviction and sentence in an unpublished, reasoned decision, *People v. Powell*, No. A121596, 2010 WL 1006929 (Cal. Ct. App. Mar. 19, 2010), but it corrected Powell's presentence credits by increasing his credits by 100 days, to a total of 1,490 days, *id.* at *9. On June 20, 2010, the California Supreme Court denied Powell's petition for review without opinion or citation to authority.

The California Court of Appeals summarized the evidence against Powell as follows:

F.J. was born to Robin and Forrest J. in May 1987. The couple had also had a son two years earlier. Robin and Forrest parted when F.J. was very young. In 1991 or 1992, by the time F.J. was four or five years old, Robin and appellant James Carl Powell became romantic partners. Powell fathered Robin's second daughter. During

the key period from 2000 through 2004, Robin and Powell lived together in a house with Robin's three children, her sister and her elderly mother. The family's home life in Vacaville was chaotic. The house was dirty and frequented by people who used drugs. Robin and Powell used methamphetamine during this time period. From the time she was 13, F.J. also used methamphetamine and marijuana. Robin sometimes worked two jobs and her mother was in poor health. Powell regularly watched pornography and even used a video camera to tape Robin having sex with him. Sometimes, when Powell and Robin argued, he became violent.Powell was sometimes employed, and sometimes unemployed. He spent a lot of time with F.J. She looked up to him like a father. He coached her in soccer and wrestling.

F.J. later testified that when she was 13, Powell gave her methamphetamine and showed her a pornographic video in the bedroom he shared with Robin. He asked F.J. if she was aroused and removed some of her clothes. He touched her breasts and her clitoris, then put his finger in her vagina. Eventually, Powell ejaculated. She told a jury that this happened again and again from the time she was 13 until she was removed from her home at age 16. F.J. also reported that during those years, she and Powell engaged in vaginal intercourse once; twice, Powell videotaped her masturbating; and they orally copulated each other regularly.

F.J. told friends that she was being molested before she told family members. About a year after confiding in some friends, F.J. told her grandmother and then her brother about this. Several times, the police contacted her about third party reports of molestation that reached them. Each time F.J. denied that it was true. She was afraid to tell the truth to the police. When one officer questioned her, she did not think her denial was convincing because she was crying.

When F.J. was about 15 years old, she told her mother Robin that Powell was molesting her. Robin and Powell fought a lot after this disclosure. Powell begged F.J. to tell Robin that she had lied about this. At his request, F.J. told her mother that she had lied about the molestation because she had been angry with Powell. F.J. told Robin that she wanted Powell to move out of the house

At some point-Robin later told a jury-she reported this information to Vacaville police. The police referred Robin to the Family Investigative Response Service Team (FIRST) when she passed on F.J.'s molestation report to them. It appears that Robin did not act on this referral right away.

In the meantime, F.J. was having some other problems, too. She got into trouble using drugs, running away from home and not going to school. She lied to her mother about attending school. She went to live in Fairfield for a three-month period, but she appears to have returned to the Vacaville home at the end of that time.

Eventually, Child Protective Services removed F.J. from Robin and Powell's home on child endangerment grounds, because the home was so messy that it was unsafe. In March 2004, F.J.-who was then 16 years old-was placed in a group residence in Loomis for teenagers with substance abuse problems. She received treatment for her substance abuse, as well as mental health counseling.

In May 2004, Robin spoke with Vacaville Police Detective Patrick Cowan at FIRST about some matters arising in her home. She was so distraught that the officer

had difficulty determining what she meant to convey to him. Detective Cowan agreed to investigate the matter.

At this point, F.J. was living in the Loomis group home. While there, she stopped using drugs, began maturing and grew more confident as a result of the counseling she received. After she had been at the group home for four months, F.J. told a counselor that Powell had molested her. The counselor reported F.J.'s disclosure to law enforcement authorities.

In July 2004, F.J. spoke with Detective Cowan about the sexual abuse in a videotaped interview. She told him that the molestation began when she was 13 and continued until she was 16, that Powell molested her approximately once a week, and that she and Powell had vaginal intercourse once when she was 16. She told Detective Cowan what she remembered when she first talked with him. Over time, she remembered more and more details. F.J. told him that earlier, she had reported this molestation to Robin, but had retracted her charges later.

At the group home, Detective Cowan set up a means for F.J. to tape a pretext telephone call with Powell. On July 29 or 30, 2004, F.J. called home and told Powell that she had told her counselor about him by accident. She did not want him to get into trouble. Powell told her not to worry about it, that they would take things as they come. When F.J. asked if he meant she should lie, Powell told her no. He said that a few years earlier, F.J. had told Robin this because F.J. wanted Powell to leave and for her father to return to the home. Eventually, Powell handed the telephone to Robin. In a brief follow-up call, as soon as F.J. mentioned the police, the call was terminated. F.J. believed that Powell hung up. Soon afterward, the tape of the pretext call was delivered to Detective Cowan.

On August 19, 2004, Detective Cowan arrested Powell. He appeared to the officer to be a methamphetamine user, but Powell had no methamphetamine or drug paraphernalia on his person at the time of his arrest. His home was searched and his bedroom turned up a pornographic videotape. No methamphetamine or drug paraphernalia was found at the home. Detective Cowan also interviewed F.J.'s grandmother that day. She appeared to be very frail, but confirmed to Detective Cowan that F.J. and Powell were frequently in Powell's bedroom with the door closed.

Detective Cowan also interviewed Powell. During that videotaped interview, Powell denied watching pornography with F.J., stating that he had once owned such videos, but did not have them anymore. He admitted that F.J. had made sexual accusations against him two years earlier. She had later recanted her allegations and had not repeated them since. He told Detective Cowan that the girl had hoped that if she made this accusation, Powell would leave their home, allowing Robin and her father to reconcile. He denied any recent opportunity to speak with F.J., even when she called home. When reminded about the pretext call, Powell said that he forgot the call. When confronted with the fact that police had found a pornographic videotape in his room, Powell implied that he was entitled to watch them.

. . . .

4

The case went to trial in February 2007. By that time, F.J. was 19 years old. She told the jury that from the time that she was 13 years old until the time she was placed in the group home when she was almost 17, Powell regularly touched her breasts and vagina in a lewd manner and digitally penetrated her vagina. Typically, he used drugs and molested her at night when her mother was at work. In the first year, Powell had this sort of sexual contact with F.J. at least five times and perhaps more.

When her mother's vibrator proved too large for F.J., Powell bought her a smaller one. In the second year, Powell orally copulated F.J. and encouraged her to do the same to him. She put her mouth on his penis, but was unable to orally copulate him. He also showed her many pornographic films. Twice, when she was 15 or 16, he videotaped F.J. masturbating. She hoped that he would stop molesting her if he had this videotape. Once when she was 16, they had vaginal intercourse. Although this only happened once, Powell continued to engage in other sexual conduct with her until F.J. was removed from the home.

Once she was in the group home, F.J. began to feel safe. She missed her mother while she was living there. F.J. admitted to the jury that she made an unpermitted visit to her mother's home before Powell's arrest, while he was still living there. At that time, she had permission to visit her dad but not to go to her mother's house. F.J. begged her father to take her to see Robin and he did so. Robin admitted that she never saw Powell and F.J. engage in any sexual activity. The jury heard the tape of the pretext call made to Powell. It also saw parts of Powell's videotaped interview with Detective Cowan.

An expert in child sexual abuse accommodation syndrome testified that it was common for children not to immediately disclose sex abuse. More likely, the abuse is a secret, sometimes because the abuser pressures them to keep silent. The fact that the abuser is violent toward others is a factor tending to encourage abused children not to report sexual abuse. Children who are sexually abused often feel helpless, particularly if a responsible adult fails to protect the child because the adult is using drugs. He told the jury that delayed, conflicted and undisclosed reports of sexual abuse are common. Over time, the expert opined, child sex abuse victims tend to report more and more of what happened.

F.J. remained at the group home for almost two years. Since she left, she started attending college.

. . . .

Powell testified in his own defense. He told the jury that F.J. was four when he moved into the home with Robin and her extended family. He testified that he had a good relationship with F.J. until she began high school. At that time, F.J. began using drugs and skipping school. F.J.'s father Forrest began staying at the Vacaville house from time to time, which also caused some problems. Powell told the jury that F.J. wanted her father to live there permanently.

Powell admitted using methamphetamine, but categorically denied engaging in any sexual conduct with F.J., showing her pornography or providing her with drugs. He also denied inflicting any physical abuse on Robin.

Powell also testified about several issues arising from his interview with Detective Cowan. He explained to the jury that when he told the officer that he no longer owned any pornographic videotapes, he did not know that the one that Detective Cowan found was still in his bedroom. When questioned about his denial of contact with F.J., he testified that the pretext telephone call had slipped his mind. When the second call came, he did not hang up when F.J. mentioned the police-the call was cut off. He admitted saying when he was arrested that he had no idea why this had happened.

*Powell*, 2010 WL 1006929, at *1-4 (footnotes omitted).

## II.  ISSUES/GROUNDS RAISED/AFFIRMATIVE DEFENSE

In his Petition to this Court, Powell raises three issues: (1) that the trial court coerced the jury in violation of Powell's constitutional right to a fair trial by instructing the jury to continue to deliberate after "the vast majority of jurors had declared a 'fair' verdict could not be reached without wearing down the lone holdout juror," Doc. No. 7 at 4,17-19; (2) prosecutorial misconduct; and (3) that Powell's trial counsel provided ineffective assistance by failing to object to and ask for a more complete legal definition of the term "vulnerable" that was given to the jury by the trial court in order for the jury to determine whether this special allegation—which could be used as an aggravating factor at sentencing—was true.  Respondent does not assert any affirmative defenses.  *See* Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(b) (2011) ("The answer must . . . state whether any claim in the petition is barred by a failure to exhaust state remedies, a procedural bar, non-retroactivity, or a statute of limitations.").

## III.  STANDARD OF REVIEW

The standard of review governing federal habeas petitions is contained in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), which applies to all federal habeas petitions filed after the statute's enactment in April 1996.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997) (noting that Congress's intent was for AEDPA to apply to

cases that were filed after the statute's enactment).  Because Powell filed his Petition after the effective date of the statute, its provisions apply to his case.

Under AEDPA, this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

A state-court decision is "contrary" to federal law "if the state court applies a rule that contradicts the governing law set forth" in controlling, Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 362, 405-06 (2000).  The Supreme Court has noted that "[a]voiding these pitfalls does not require citation of our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8 (2002).

When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be "objectively unreasonable," not just "incorrect or erroneous."  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citing *Williams*, 529 U.S. at 409-10, 412).  The Supreme Court has made clear that the "objectively unreasonable" standard is "a substantially higher threshold" than simply believing that the state-court determination was incorrect.  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410). "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and

demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks and citations omitted).  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a "substantial and injurious effect" or influence in determining the outcome.  *Fry v. Pliler*, 551 U.S. 112, 121 (2007).  Because "[s]tate court judgments of conviction and sentence carry a presumption of finality and legality," the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.  *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002).

The Supreme Court recently underscored the magnitude of the deference required:

As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.* Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *See Early*, 537 U.S. at 10 (explaining that clearly established federal law under must be based on Federal Constitutional grounds).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam) (stating that when no Supreme Court case gives a "clear answer to the question presented," then the state-court decision cannot be contrary to or an unreasonable application of clearly established federal law); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).  Accordingly, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established" by the Supreme Court. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).

In applying these standards in habeas review, this Court reviews the "last reasoned decision" by the state court. *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  State appellate court decisions that

summarily affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court. *Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning."); *Ylst v. Nunnemaker*, 501 U.S. 797, 802-03 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."). This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court. *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." (citing 28 U.S.C. § 2254(e)(1))). This presumption applies to state-trial courts and appellate courts alike. *See Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004) ("Stevenson does not address these factual findings, let alone challenge them with clear and convincing evidence. Accordingly, we presume them to be correct." (citing 28 U.S.C. § 2254(e)(1); *Pollard v. Galaza*, 290 F.3d 1030, 1035 (9th Cir. 2002))).

A state court is not required to give reasons before its decision can be deemed to be "adjudicated on the merits." *Richter*, 131 S. Ct. at 784-85 (2011). When there is no reasoned state-court decision denying an issue presented to the state, "it may be presumed that the state

10

court adjudicated the claim on the merits in the absence of any indication or state law procedural principles to the contrary." *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).  However, "[t]he presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst*, 501 U.S. at 803).  Where the presumption applies, this Court must perform an independent review of the record to ascertain whether the state-court decision was "objectively unreasonable." *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (quoting *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam)).  In conducting an independent review of the record, this Court presumes that the relevant state-court decision rested on federal grounds. *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991) ("The presumption at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision."); *see also Harris*, 489 U.S. at 263.

Moreover, this Court gives that presumed decision the same deference as a reasoned decision. *Richter*, 131 S. Ct. at 784-85,  The scope of this review is for clear error of the state court ruling on the petition:

> [A]lthough we cannot undertake our review by analyzing the basis for the state court's decision, we can view it through the "objectively reasonable" lens ground by *Williams*. . . . Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.  Only by that examination may we determine whether the state court's decision was objectively reasonable.

*Delgado v. Lewis* (*Delgado II*), 223 F.3d 976, 982 (9th Cir. 2000).   "[A]lthough we

independently review the record, we still defer to the state court's ultimate decision." *Pirtle v.*

*Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

IV.  DISCUSSION

Ground One: Coercive Jury Instruction

Powell contends that the trial court coerced the jury, in violation of his constitutional

right to a fair trial, by instructing the jury to continue to deliberate after "the vast majority of

jurors had declared a 'fair' verdict could not be reached without wearing down the lone holdout

juror."  Doc. No. 7 at 4.

1.  State Court Decisions

The California Court of Appeals summarized the facts concerning the jury deliberations

at Powell's trial as follows:

> The jury heard trial evidence over the course of three days. Closing arguments
> were offered on the fourth day-February 26-and the jury began its deliberations that
> afternoon. The following afternoon, the possibility of jury deadlock was raised. The
> jurors advised the trial court that they had agreed on a verdict for the
> methamphetamine count, but could not agree on the sexual offense charges.
>
> The trial court questioned the jurors about the possibility of deadlock, asking
> inter alia about the numerical split among the jurors. The jury foreperson reported
> that after one ballot, the jurors were split nine to three. The foreperson also revealed-
> despite the trial court's instruction not to do so-that nine of the jurors favored
> conviction. When it finished its inquiry, the trial court ordered the jury to resume
> deliberations. Despite Powell's argument that the jury was deadlocked and that
> inappropriate disclosures about the deliberations had been given, his motion for
> mistrial was denied.
>
> On February 28, the trial court learned from the jury foreperson of one juror's
> belief that a minor's testimony would never be sufficient to convict a defendant. After
> a thorough inquiry, a juror's categorical belief that a minor's testimony would not be
> sufficient to convict a defendant led the trial court to grant the prosecution's motion

to disqualify the juror for being untruthful during voir dire and to dismiss him for bias. Powell's motion to disqualify the jury foreperson was also denied.

On Thursday, March 1, an alternate juror was seated and the newly composed jury was ordered to begin deliberations anew. This jury began its deliberations and worked at that task most of the day. Deliberations continued on Friday, March 2. That morning, the jury returned to court and advised the trial court that they had reached a verdict on the methamphetamine charge, but were deadlocked on the other nine counts. The trial court asked the foreperson about this matter and learned that the jury was split 11 to 1 after three ballots.

When the jury was questioned, half of the jurors stated that the jury was hopelessly deadlocked and that further deliberations could not bring about a verdict. Of the remaining six jurors, three seemed to believe that further deliberations could bring about a verdict and three others were unsure whether or not further deliberations would do so. Then, one of the jurors stated that he believed that continued deliberations would not be fruitful because the jurors were tired. He feared that the holdout juror might render a decision based, not on the evidence, but because he had been worn down by the other jurors. A defense motion for mistrial was made and denied at this point.

In light of this concern, all the jurors were questioned again-this time, about whether continued deliberations could result in a *fair* verdict. One juror believed that this could be done and one was uncertain. All of the others opined that further deliberations would not produce a fair verdict. This prompted Powell to renew his motion for mistrial, arguing that the trial court should accept the view of the majority of the jurors who believed that the jury had hung. The trial court disagreed, determining that further deliberations were warranted, if the jurors were instructed not to place pressure on the holdout juror. It also noted its intent to instruct the jurors about this and then release them for the day, so they could return refreshed on the next court day, Monday, March 5.

When the jurors returned to the courtroom, the trial court ordered the jury to continue deliberations. It instructed the jury at length about the deliberations process, the duties of jurors, and the need for each juror to offer his or her individual judgment on the counts before them. (See pt. II.A.3., *post.*) The trial court asked if the jurors wanted to continue deliberating or if it would help to allow everyone to leave and resume deliberating on Monday morning. About 3:50 p.m., the jurors decided to continue deliberating for the rest of the afternoon. The trial court provided a written version of its instruction, at the jury's request. The jury continued to deliberate until shortly after 5:00 p.m., when they were released until Monday.

On Monday, March 5, the jury resumed deliberations after a brief trial court comment acknowledging that the jurors might be unable to reach a fair and impartial verdict. Within a few minutes, the jurors reached a verdict on all 10 counts, found Powell guilty of all charges and found all three special allegations to be true.

Later, when Powell's new trial motion was pending, the jury foreperson filed a declaration stating inter alia that jury deliberations began after an alternate juror

13

was sworn in on March 1; that the jurors reached a guilty verdict on all counts by the end of the day on Friday, March 2; that the jurors as a group decided to take the weekend to reflect on their verdict; that the jurors returned to their deliberations on Monday, March 5; and that after a weekend of reflection, all 12 jurors voted to convict Powell in a single ballot taken that morning. The trial court ruled that much of what was contained in the jury foreperson's declaration was properly before it.

The trial court rejected the motion for new trial, which was premised on Powell's argument that the jury had been coerced into reaching a verdict. It observed that at the time that the jury was ordered to resume deliberations, there were jurors who believed that more time was needed for deliberation and that the jurors had deliberated for a relatively short time on very serious charges before concluding that they were deadlocked. The trial court rejected the contention that ordering further deliberations denied Powell a fair trial and affirmed its decision to deny his motion for mistrial.

*Powell*, 2010 WL 1006929, at *5-7 (footnotes omitted) (citation omitted).

In rejecting Powell's claim on appeal, the California Court of Appeals noted that it was bound by a number of decisions of the California Supreme Court which essentially held that the "decision whether to declare a hung jury or to order further deliberations rests in the sound discretion of the trial court." *Id.* The court explained that under an abuse of discretion standard, "the validity of a claim that a jury was pressured into reaching a verdict turns on the unique circumstances of each case." *Id.* The court added:

While the trial court must exercise its discretion in a careful manner that does not coerce the jury into abdicating its independent judgment in favor of compromise and expediency, the court may direct further deliberations if it reasonably concludes that this direction would be seen as a means of enabling jurors to enhance their understanding of the case, rather than merely pressuring jurors to reach a verdict on the basis of matters already discussed and considered.

*Id.*

The California Court of Appeals concluded that "the trial court acted within its discretion in ordering further deliberations, based on several factors," including the fact that the reconstituted "jury had deliberated less than two full days when the issue of jury deadlock arose,"

14

which the court noted "was a relatively short period of time . . . given the number and seriousness

of the charges and other allegations facing Powell." *Id.* at *8. Moreover, the state-appellate

court noted that two jurors "could not rule out the possibility that further deliberations might still

result in a verdict that was fair." *Id.* Thus, "under these circumstances," the court held that "the

trial court was not unreasonable when it ordered the jurors to resume deliberations," and the trial

court therefore did not abuse its discretion by ordering further deliberations." *Id.*

In addition, the California Court of Appeals categorically rejected Powell's claim that the

"instruction by the trial court effectively coerced the jury into reaching a verdict." *Id.* According

to Powell, the evidence at trial compelled the conclusion that the holdout juror caved since the

court refused to accept the deadlock and ordered further deliberations. *Id.* But the California

Court of Appeals explained that the "record on appeal d[id] not compel this conclusion." *Id.*

(alteration added). The Court summarized the specific trial court record concerning jury

deliberations as follows:

> Before the jury began deliberating, the trial court offered basic instructions
> on the duties of the jury. (CALCRIM No. 200.) It also instructed the jurors on their
> duties to talk with each other and to deliberate, instructing them to "try to agree on
> a verdict if you can." The court also instructed the jurors to "decide the case for
> yourself" after having discussed it with the rest of the jury. (CALCRIM No. 3550.)
> Once the question of jury deadlock arose among the jurors who ultimately
> decided the case, the trial court conducted a thorough inquiry and determined that
> further deliberations should be tried. It explained its thinking to the jurors: "It has
> been my experience on more than one occasion that a jury which initially reported
> it was unable to reach a verdict was ultimately able to arrive at verdicts on one or
> more of the counts before it." Then, it proceeded to instruct the jurors, in order to
> assist them in further deliberations. The trial court instructed as follows: "Your goal
> as jurors should be to reach a fair and impartial verdict if you are able to do so based
> solely on the evidence presented and without regard for the consequences [ *sic* ] of
> your verdict. It is your duty as jurors to carefully consider, weigh and evaluate all of
> the evidence presented at the trial, to discuss your views regarding the evidence, and
> to listen to and consider the views of your fellow jurors. [¶] In the course of your
> further deliberations, you should not hesitate to reexamine your own views or to

request your fellow jurors to reexamine theirs. You should not hesitate to change a view you once held if you are convinced it is wrong or to suggest to other jurors-or to suggest other jurors change their views if you are convinced they are wrong. [¶] Fair and effective jury deliberations require a frank and forthright exchange of views. As I previously instructed you, each of you must consider the case for yourself and should do so only after a full and complete consideration of all the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charges if you can do so without violence to your individual judgment. Both the People and the defendant are entitled to the individual judgment of each juror. [¶] As I previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate. May I suggest that since you have not been able to arrive at a verdict using the methods ... you have chosen that you consider to change the methods you have been following, at least temporarily, and try new methods. [¶] For example, you may wish to consider having different jurors lead the discussions for a period of time, or you may wish to experiment with reverse role-playing by having those on one side of an issue present and argue the other side's position and vice versa. This might enable you to better understand the others' positions. [¶] By suggesting you should consider changes in your methods of deliberations, I want to stress [that] I am not dictating or instructing you as to how to conduct your deliberations. I merely find you may find it productive to do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors. [¶] I also suggest that you read instruction number 200, which is the first instruction, and instruction 3550, which is towards the end. These instructions pertain to your duties as jurors and make recommendations on how you should deliberate. The integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by these instructions. Instruction 200 defines the duties of a juror. And instruction 3550 defines the jurors' duty to deliberate and how they should approach their task. [¶] The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the court. These are the matters these instructions require you to discuss for the purpose of reaching a verdict if you can do so. [¶] You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments, and suggestions I have just made and the instructions now presented to you. [¶] I hope my comments and suggestions may have some assistance to you. I would like to state that it's not the intent of this court to engage in any coercion of this jury or of any juror. I would like to reiterate that it is your duty as jurors to deliberate with the goal of arriving at a verdict on the charges if you can do so without violence to your individual judgment, and both the People and the defendant are entitled to the individual judgment of each juror." The trial court, noting that some jurors had expressed a belief that further deliberations might result in a verdict, was prepared to allow the jurors to continue deliberating in order "to see if the jury can arrive at a verdict if that's possible." After the weekend had lapsed and the jurors returned to tally their final vote, the trial court reminded them of their duty to reach a fair and impartial

verdict based solely on the evidence, and acknowledged that the jury might not be able to do so.

*Id.* (footnote omitted).

The California Court of Appeals gave several reasons for rejecting Powell's claim that the trial court's instruction was coercive. The court noted that "the trial court made no comment about the status of the vote," and "made no statement that could be interpreted as exerting pressure on any juror." *Id.* at *9. In addition, the court stated that the trial court "upheld each juror's duty to reach his or her independent judgment on the case, expressly disavowed any intent to coerce the jury, and ordered that deliberations continue *in case* it was possible to reach a verdict." *Id.* Moreover, the court explained that the "trial court never told the jury that it was required to reach a verdict," and that the "judge's parting comment to the jury before their final ballot on Monday, March 5, was an express acknowledgment of the possibility that the jury might *not* be able to reach a fair verdict." *Id.* (footnote omitted). Accordingly, the California Court of Appeal held that "the language of the instructions given by the trial court in this matter satisfies us that no reasonable possibility of jury coercion existed." *Id.*

2. Analysis

The Supreme Court has stated that a criminal defendant "being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). The use of a supplemental jury instruction by a trial court instructing a jury to continue to deliberate, nonetheless, "has long been sanctioned." *See id.* at 237 (citing *Allen v. United States*, 164 U.S. 492 (1896)).[1] The Supreme Court has stated that in reviewing a claim that a jury was improperly

---

[1] An *Allen* charge refers to a supplemental instruction where the jurors in the minority view during deliberations are encouraged by the trial court to consider the views of the majority.

coerced by the trial court's supplemental jury instruction to continue to deliberate requires that the supplemental charge given by the trial court be reviewed "in its context and under all the circumstances." This test—essentially a totality of the circumstances test—does not, however, "demand a formulary statement that the trial court's actions and inactions were noncoercive 'individually and cumulatively.'" *Early*, 537 U.S. at 9. Moreover, in situations similar to Powell's, where the jury is potentially deadlocked during its deliberations, the Supreme Court has stated that there are "compelling" reasons why the trial judge has broad discretion "in cases involving a potentially deadlocked jury," most notably because "the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." *Renico*, 130 S. Ct. at 1862 (citing *Arizona v. Washington*, 434 U.S. 497, 509-10 (1978)).

Thus, in looking at Powell's claim that the trial court's supplemental charge to the jury coerced a guilty verdict in violation of his Fifth, Sixth, and Fourteenth Amendment rights, this Court's review is highly deferential and must assess whether the court of appeals applied a totality of the circumstances test in determining that the trial court's supplemental jury instruction was not coercive. *Id.* ("AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt.").

---

*See Lowenfield*, 484 U.S. at 237 (citing *Allen*, 164 U.S. at 501-02). The California Supreme Court imposes greater restrictions on supplemental jury instructions in an effort to avoid potentially coercive jury instructions. *Compare People v. Gainer*, 556 P.2d 997 (Cal. 1977), *with Allen*, 164 U.S. 492 (1896); *see Early*, 537 U.S. at 8 (noting the difference between *Allen* and *Gainer*).

The California Court of Appeals thoroughly examined the trial court's instructions to the jury in determining its actions did not coerce the jury.  In fact, it meticulously considered the instructions by the trial court and gave multiple reasons why the trial court's instructions were not coercive.  Although the Supreme Court does not even require "a formulary statement that the trial court's actions and inactions were non coercive 'individually and cumulatively," *Early*, 537 U.S. at 9, the California Court of Appeals gave a reasonable explanation as to why, both individually and cumulatively, the supplemental instruction by the trial court was not coercive.  It explained that: (1) the jury had deliberated for a "relatively short period of time"; (2) two members of the jury felt further deliberations might still result in a verdict that was fair; (3) "the trial court made no comment about the status of the vote"; (4) the trial court "made no statement that could be interpreted as exerting pressure on any juror"; (5) the trial court "upheld each juror's duty to reach his or her independent judgment on the case, expressly disavowed any intent to coerce the jury, and ordered that deliberations continue in case it was possible to reach a verdict"; (6) "the trial court never told the jury that it was required to reach a verdict"; and (7) "the judge's parting comment to the jury before their final ballot . . . was an express acknowledgment of the possibility that the jury might not be able to reach a fair verdict." *Powell*, 2010 WL 1006929 at *8-9.  Accordingly, the decision of the California Court of Appeals finding no coercion cannot be contrary to controlling Supreme Court precedent.

Additionally, the California Court of Appeals decision was not an unreasonable application of clearly established law for yet another reason.  As Respondent points out, the Supreme Court, in *Early v. Packer*, 537 U.S. 3 (2002), a case that is very similar in both facts and circumstances to Powell's case, ruled that the state appellate court's determination was not

contrary to clearly established federal law.  *Id.* at 9-11.  There, the jury indicated it might be

deadlocked and the lone holdout juror sent several notes to the trial court noting that she felt she

was unable to continue deliberating.  *Id.* at 4-6.  The trial court instructed the jury that, among

other things, "the juror has the right . . . to disagree with everybody else.  But they do not have a

right to not deliberate.  They must deliberate and follow the rules and law as I state it to them."

*Id.* at 5.  The trial court added that "you apply the facts to the law and you arrive at a decision . . .

[and] you must find them either guilty or not guilty of that charge."  *Id.*  Even after this

instruction, and after the jury had a day off, the lone holdout jury sent another note to the judge

expressing her frustration, but the trial court questioned her privately and she agreed to continue

deliberating.  *Id.* at 6.  The following day the jury found the defendant guilty.  *Id.*

Although the Ninth Circuit ruled that the appellate court failed to apply controlling

federal law for several reasons, including that the appellate court failed to apply the totality of the

circumstances test under *Lowenfield*, the Supreme Court reversed,[2] explaining in pertinent part:

"even if we agreed with the Ninth Circuit majority . . . that there was jury coercion here, it is at

least as reasonable to conclude that there was not, which means that the state court's

determination to that effect must stand."  *Id.* at 11.  Here, it is at least arguable that the actions of

the trial court in Powell's case were much less coercive in nature than the defendants's situation

---

[2]  The Supreme Court made clear in *Early* that the totality of the circumstances test from *Lowenfield* properly applied when dealing with a supplemental jury instruction that is alleged to be coercive in nature.  *See Early*, 537 U.S. at 9 ("Compliance with *Lowenfield* . . . does not demand a formulary statement that the trial court's actions and inactions were noncoercive 'individually and cumulatively.'").  The Supreme Court explained, however, that the Ninth Circuit's analysis of the state appellate court's application of the test was flawed, noting that the state appellate court had, in fact, applied the test and the Ninth Circuit's explanation to the contrary was an "exaggeration" and "strained credulity."  *Id.*

in *Early*.  Thus, the California Court of Appeal's decision was also not contrary to clearly

established federal law in light of *Early*.  *See Williams*, 529 U.S. at 405-06 ("[A] state-court

decision is also contrary to this Court's precedent if the state court confronts facts that are

materially indistinguishable from a relevant Supreme Court precedent and arrives at a result

opposite to ours.").  Accordingly, this Court cannot say that the decision of the California Court

of Appeals was "contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States" or "was based on an

unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."  28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 402-406; *Andrade*, 538 U.S. at 70-75

(explaining this standard).  Powell is not entitle to relief under his first ground.

B.  Ground Two: Prosecutorial Misconduct

Powell contends that the prosecutor committed prosecutorial misconduct by arguing a

false inference in her closing argument, which she knew to be untrue, and on a topic which she

convinced the trial court to exclude based on a motion in limine.  Powell further claims that this

misconduct violated his Fifth and Fourteenth Amendment rights to due process.  Doc. No. 7 at 4,

35-38.

1.  State Court Decisions

The California Court of Appeals summarized the record as it pertains to
Powell's prosecutorial misconduct claim as follows:

Before trial, the parties knew that investigators had received two classes of
reports of Powell's molestation of F.J. First, on at least three and perhaps four
occasions, third party reports that F.J. might have been molested-perhaps by Powell,
perhaps by other men-had reached police before F.J. made her own allegation of
molestation.

When investigators spoke with F.J. about these third party reports-apparently,
between July 2002 and April 2003-she denied having been molested. There was no

evidence that police officers pursued these reports once F.J. denied that any molestation had occurred. Detective Cowan had investigated one of the third party reports that F.J. had denied.

A second class of allegations arose in July 2004, when F.J. made her own charge that Powell had molested her from 2000 through 2004. Her allegations prompted criminal action against Powell. Detective Cowan was the investigating officer when F.J. herself reported when Powell had molested her.

The trial court entertained numerous motions in limine relating to the admissibility of evidence. An understanding of two assist in the resolution of this issue on appeal. In the first, Powell moved to preclude the prosecution from bringing out the testimony of police officers about their opinions of the truthfulness of F.J.'s own allegations of molestation. He reasoned that a police officer's opinion of the truth or falsity of a crime report was improper opinion testimony and thus, not admissible evidence. The police could describe F.J.'s demeanor, Powell argued, but it was for the jury to decide the ultimate issue of whether or not her report of molestation was truthful.

The prosecutor did not contest the motion, as she did not intend to elicit this evidence in her case-in-chief. If the defense introduced character evidence suggesting that F.J. was untruthful, then the prosecution would seek to produce this evidence in rebuttal. The trial court granted the motion to exclude this opinion evidence, ruling that if Powell opened the door with evidence about F.J.'s veracity, the prosecution could seek leave of court to introduce rebuttal evidence of the witness's credibility. If rebuttal evidence was warranted, a foundational hearing would be required before that evidence could be admitted. This order precluded the prosecution from asking police officers whether they believed that F.J. was being truthful or not when she reported that she was being molested.

. . . .

The second relevant motion in limine was raised orally by the prosecution and related to the police evaluation of the earlier third party reports of molestation. The prosecutor sought to preclude Powell from bringing out evidence that police officers concluded that the earlier third party reports of sexual abuse at Powell's hand were unfounded after F.J. denied that any sexual abuse had occurred. When the police receive third party reports of molestation and the alleged victim fails to affirm them, the police must find that the allegations are unfounded, but the fact that the reports are deemed to be unfounded does not necessarily mean that the officers did not believe the alleged victim. In support of her motion in limine, the prosecutor argued that allowing this evidence to be admitted would be akin to asking the officers if they believed F.J. She reasoned that asking those officers if they concluded that the molestation charges were founded or unfounded might leave jurors with a false impression that the officers did not believe F.J.

The evidence that F.J. denied the earlier third party reports of molestation when asked about them was clearly admissible to impeach the credibility of her later testimony that Powell had molested her during this same time period. Defense counsel also sought to bring out evidence that the police did not follow-up on the

reports because they determined that the various reports were unfounded. He argued that the fact that the police had prior reports of molestation, but that they found no evidence to support them or failed to follow-up on those reports was part of the totality of the circumstances showing whether or not the charged acts occurred.

The prosecutor objected that this evidence was inadmissible opinion evidence. She argued that just as it would be inappropriate to ask Detective Cowan whether he submitted a molestation report in July 2004 because he believed F.J.'s claims that she had been molested, it would be inappropriate to ask the officers who received the prior molestation reports whether they decided not to go forward with an investigation because they believed that those reports were unfounded.

Defense counsel stated that he did not intend to offer evidence of whether or not the officers believed that F.J. had been molested. He *did* seek to offer evidence that after they took F.J.'s statement, the police took no further action on the third party molestation reports. The prosecution admitted that the fact that F.J. denied the prior reports of molestation was relevant evidence, but argued that the fact that the police did nothing further about them was irrelevant.

At this stage of the case, the trial court had yet to review the earlier third party molestation reports. As such, it deferred ruling on the prosecution's motion in limine until the case was underway. It expressed a desire to review a complete record of the specific evidence that Powell would offer and the theory of its relevance. It indicated that it would set aside time-perhaps in the following week-for defense counsel to set out those reports and for both sides to argue the motion, based on the trial court's understanding of the reports.

Opening statements were about to be given, and the prosecutor expressed her concern that defense counsel would mention unfounded molestation allegations during his opening statement, before the trial court could rule on the pending motion. The trial court allowed defense counsel to discuss in his opening statement that F.J. had been contacted by officers earlier and had denied third party reports of allegations, but it did not permit Powell's attorney to go into the conclusions that these officers reached on the basis of F.J.'s denials. The trial court's last word on this subject was to ask counsel to remind the court that the underlying motion was still unresolved and that a ruling needed to be made.

The record on appeal does not show any further argument or ruling on the prosecution's motion in limine beyond the limitations of defense counsel's during opening argument. There is no record showing that the trial court ruled in the manner that the prosecution asked-that is, in a manner that would have precluded defense counsel from eliciting evidence from the police officers who investigated earlier third party reports of molestation about whether they concluded that those reports were unfounded after F.J. denied the reports.

At trial, F.J. stated that she had been contacted by police "a number of times" before she told her mother about Powell's sexual abuse. When asked by police about these early molestation reports, F.J. consistently denied that Powell molested her. She told the jury that at least once, the police must have known that she was lying because she was crying when she made her denial. On cross-examination, Detective

Cowan admitted that the police had had contact with F.J. before she reported that Powell had molested her. Detective Ray Donaldson testified that in July 2002, he interviewed F.J. about a third party report of molestation. She denied that anyone had touched her in an inappropriate manner and she made no complaint about Powell.

. . . .

During his closing argument, defense counsel urged the jury to conclude that the best evidence that Powell had not molested F.J. was her repeated denials of prior third party reports of molestation. He argued that the officers who heard those denials believed F.J.-that they knew that she was telling them the truth when she said that she had not been molested. He invited the jury to conclude that Detective Cowan did not take F.J.'s allegations of molestation seriously because he left her alone in the group home in Loomis even after she confronted Powell about her charges-an apparent reference to the pretext call. If the officer believed that F.J. was really in physical or emotional danger from Powell, he would not have left her unguarded in the group home, defense counsel argued. He urged the jury to conclude that Detective Cowan did not take F.J.'s allegations seriously because she had lied in the past.

In her rebuttal argument, the prosecutor noted that defense counsel had argued that the police did not act as if they believed F .J. She continued: "Why didn't [defense counsel] ask him if they believed her? He was on the stand. Why didn't [defense counsel] ask Detective Cowan that?" Defense counsel objected, suggesting that this argument violated an in limine order. A discussion took place off the record. When the prosecutor continued her rebuttal argument, she argued that defense counsel wanted the jurors to assume facts that were not before them about whether people did not believe F.J.'s reports of molestation. Later, when discussing F.J.'s initial denials of third party reports of molestation, the prosecutor reminded the jurors that F.J. had testified that she did not think her denials were convincing because she was tearing up when she made them.

Outside the presence of the jury, defense counsel made a record of his earlier objection to the prosecutor's argument. He explained that in his closing argument, he argued that the police failed to follow-up on the third party reports of molestation, urging the jury to infer that the officers failed to do so because they did not believe that the reports were true. He complained that during rebuttal, the prosecutor asked why he did not ask Detective Cowan whether he believed the reports of molestation. The rebuttal argument that the prosecutor made implied that he could have asked Detective Cowan if he believed the reports, which he reasoned that an in limine order precluded him from doing. Defense counsel not only argued that this was misconduct, but that this misconduct was made worse by the fact that if Detective Cowan had been asked the question, he would have testified that he believed that the reports were unfounded. Thus, he reasoned, the prosecutor's argument violated both the in limine order and implied a state of facts that she knew to be untrue.

The prosecution argued that the in limine order precluded the prosecution-not the defense-from asking whether Detective Cowan believed F.J. when she reported that she had been molested. The prosecutor also reasoned that once defense counsel

24

urged the jury to infer that Detective Cowan did not believe F.J., it was appropriate for her to respond to that argument by asking the jury to draw a different inference.

Defense counsel countered that there were two in limine orders at issue. He agreed that the prosecution was bound by one of them not to ask if Detective Cowan believed F.J. He asserted that the *second* in limine motion made by the prosecution had resulted in an order precluding him as Powell's counsel from asking police officers whether they believed that the allegations of molestation were unfounded. He recalled that the evidence was ruled inadmissible as improper opinion testimony. He reasoned that asking law enforcement officers what they did and urging the jury to infer from the officers' responses that they did not believe the molestation allegations was proper. Defense counsel argued that the prosecution could properly have argued on rebuttal that the facts did not support the inference that he urged the jury to draw. However, to argue that defense counsel could have cleared up this matter by questioning Detective Cowan when he was precluded by an in limine order from doing so was improper, he argued. As he could see no remedy to this error, Powell sought a mistrial.

The trial court denied the motion for mistrial. It noted that at the time that the initial objection was posed and the bench conference occurred, it had not admonished the prosecutor, finding her argument permissible. It recalled the in limine order as precluding the defense from asking whether witnesses believed F.J. or not. It did not recall an order precluding any party from making an inquiry into whether or not the earlier reports of molestation were determined to be unfounded. The trial court perceived a distinction between these two types of inquiries. When the complaining witness fails to confirm third party reports of molestation, the police must find that the reports are unfounded, but the fact that the reports are unfounded does not necessarily mean that they did not believe the witness.

The trial court invited both counsel to explain their recollection of the in limine motion at issue. Defense counsel recalled discussing both an officer's belief and the fact that a report was unfounded. The prosecutor recollected that the in limine orders precluded her from asking about an officer's belief, and precluded the defense from asking whether the allegations were unfounded.

The trial court-apparently satisfied with its own recollection of its rulings-again concluded that the prosecution's argument did not violate its order. It ruled that nothing had occurred that would justify a mistrial. It also noted that once the bench conference was completed, the prosecutor did not pursue this argument, but moved on to other issues. As such, it concluded that the argument had done no harm.

*Powell*, 2010 WL 1006929, at *12-16.

On appeal, Powell argued that "the prosecutor knowingly urged the jury to draw an inference that she knew was false, after having obtained a court ruling precluding the defense from bringing out the evidence that would have supported a contrary inference." *Id.* at 17.  In

rejecting Powell's claim of prosecutorial misconduct, the California Court of Appeal noted that

while "a prosecutor may argue all reasonable inferences that may be drawn from the record, it is

misconduct for a prosecutor to ask the jury to draw an inference that they jury might not have

drawn if it heard evidence that the trial court excluded." *Id.*  The court stated, however, that the

"record on appeal d[id] not show that the trial court ever issued an order barring the subject

inquiry." *Id.*  Indeed, the court explained that a "motion was made that, if successful, might have

precluded trial counsel from asking whether Detective Cowan believed F.J.'s allegations of

molestation, but hearing on that motion was deferred," and that there was no evidence on the

record "that the trial court issued a final ruling on the motion."  Thus, the California Court of

Appeal concluded:

> The record on appeal demonstate[d] that the trial court made a preliminary ruling
> limiting defense counsel's opening statement, in contemplation of issuing a ruling on
> the motion in limine sometime after the opening statements had been given.  The trial
> court never ruled on the prosecutions motion in limine to preclude defense counsel
> questioning, beyond the initial discussion of the limitations to be observed in the
> opening statement. As Powell has not demonstrated that any order precluded the line
> of inquiry that the prosecutor referenced during closing argument, his claim of
> prosecutorial misconduct for violating that order necessarily fails.

*Id.*

2. Analysis

A prosecutor may "prosecute with earnestness and vigor—indeed, he should do so."

*Berger v. United States*, 295 U.S. 78, 88 (1935).  "To warrant habeas relief, prosecutorial

misconduct must 'so infect the trial with unfairness as to make the resulting conviction a denial

of due process.'"  *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004) (quoting *Darden v.

Wainwright*, 477 U.S. 168, 181 (1986)).

> In determining whether a comment rendered a trial constitutionally unfair, factors [the court] may consider are whether the comment misstated the evidence, whether the judge admonished the jury to disregard the comment, whether the comment was invited by defense counsel in its summation, whether defense counsel had an adequate opportunity to rebut the comment, the prominence of the comment in the context of the entire trial and the weight of the evidence.

*Hein v. Sullivan*, 601 F.3d 897, 912-13 (9th Cir. 2010); *see Darden*, 477 U.S. at 182.

In essence, what is required is that reviewing courts consider the equivalent to evaluating whether there was a "reasonable probability" of a different result.  *See Hein*, 601 F.3d at 914-15.  "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned."  *Darden*, 477 U.S. at 181 (citations and internal quotation marked omitted).  "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id.*  "Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom."  *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996).  "But, while [the government] may strike hard blows, [it] is not at liberty to strike foul ones."  *Berger*, 295 U.S. at 88.

Here, however, this Court need not address the prosecutorial misconduct claim because it is based on a misinterpretation of the state appellate court's finding of facts.  Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. 340 ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." (citing 28 U.S.C. § 2254(e)(1))).  This presumption applies to state-trial courts and appellate courts alike.  *See Stevenson*, 384 F.3d at 1072 ("Stevenson does not address these factual findings, let alone challenge them with clear and

27

convincing evidence.  Accordingly, we presume them to be correct." (citing 28 U.S.C. §

2254(e)(1); *Pollard*, 290 F.3d at 1035)).

     Powell has simply introduced nothing to rebut the California Court of Appeal's finding

that the trial court never actually ruled on the prosecution's motion in limine.  As the appellate

court explained, "[t]he record on appeal does not show that the trial court ever issued an order

barring the subject inquiry."  *Powell*, 2010 WL 1006929, at*17.  It added, "[a] motion was made

that, if successful, might have precluded trial counsel from asking whether Detective Cowan

believed F.J's allegations of molestation, but hearing on that motion was deferred."  *Id.*  Indeed,

the California Court of Appeal concluded:  "[t]here is no evidence that the trial court issued a

final ruling on the motion." *Id.*  Because Powell introduces no evidence to the contrary, much

less clear and convincing evidence that the trial court ever ruled on the motion which would have

precluded the prosecution's statement in question in her closing, *Miller-El*, 537 U.S. at 340;

*Stevenson*, 384 F.3d at 1072, Powell is not entitle to relief under his second ground.

     Accordingly, this Court cannot say that the decision of the California Court of Appeals

was  "contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States" or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."  28

U.S.C. § 2254(d); *Williams*, 529 U.S. at 402-406; *Andrade*, 538 U.S. at 70-75 (explaining this

standard).

C.  Ground Three: Particularly Vulnerable Instruction and Ineffective Assistance of Trial Counsel

     In his Petition to this Court, Powell argues that the trial court violated his Fifth, Sixth,

and Fourteenth Amendment rights by failing to give the jury the full definition of "particularly

vulnerable" when the jury asked the trial court for the legal definition of "vulnerable."  Doc. 7 at

5, 31.  Additionally, Powell claims that his trial counsel was ineffective for failing to object to

the trial court's definition of "particularly vulnerable."

1.  State Court Decisions

The California Court of Appeals summarized the facts concerning the trial court's legal

definition of "vunerable" as follows:

> In the trial court, the jury was instructed that if it found Powell guilty of any
> of the charged offenses, it must also determine several special findings, including
> whether F.J. was particularly vulnerable. The jury was instructed that the prosecution
> had the burden of proof beyond on each of these special
> allegations. These findings related to aggravating circumstances that might be used
> as sentencing factors. During its Friday, March 2 deliberations, the jurors asked for
> a legal definition of the term "vulnerable" as it related to this special allegation.
>
> Outside the presence of the jury, in an unrecorded discussion, the trial court
> met and conferred with counsel about an appropriate response to this inquiry. Relying
> on a definition from case law, the trial court crafted a response, to which defense
> counsel did not object. The trial court defined the term "particularly vulnerable" for
> the jury as "defenseless, unguarded, unprotected, accessible, assailable, one who is
> susceptible to a criminal act." Armed with this definition, the jury found that F.J. was
> particularly vulnerable. It also found two other alleged aggravating circumstances to
> be true-that Powell induced a minor to commit or assist in the commission of the
> drug offense, and that he took advantage of a position of trust. At sentencing, after
> noting the jury's finding that F.J. was particularly vulnerable, the trial court found all
> three of these aggravating circumstances were true. It cited these circumstances as
> reasons for sentencing Powell to an upper term for the principal offense of
> continuous child abuse.

*Powell*, 2010 WL 1006929, at *10 (citations omitted).

In rejecting Powell's claim of ineffective assistance of counsel, the California Court of

Appeals noted that a "claim of ineffective assistance of counsel requires findings of both

incompetence of counsel and prejudicial effect," *id.* (citing *Strickland v. Washington*, 466 U.S.

668, 694 (1983)), but noted that since "an ineffective assistance of counsel claim fails on an

29

insufficient showing of either of these two elements, a court need not decide the issue of

counsel's alleged deficiencies before deciding if prejudice occurred." *Id.*  The court explained:

> Even if we assume that defense counsel should have sought a better definition of the term at issue, Powell cannot demonstrate that he suffered any prejudice as a result of this presumed error. As we shall explain, our review of the record before us establishes that the trial court relied on its own findings-not those of the jury-at sentencing.

> At the time that the offenses were charged against Powell, California's determinate sentencing law set out three possible sentences for these offenses. Before 2007, the determinate sentencing law presumed that the midterm was the proper choice, but allowed a trial court to impose the upper term if it found one or more aggravating circumstances warranted the greater sentence. In January 2007, the United States Supreme Court found unconstitutional the requirement that a trial court-rather than a jury-determine aggravating circumstances that might result in the imposition of a higher sentence. This requirement was found to violate a defendant's constitutional right to trial by jury.

> The *Cunningham* court suggested that if California law eliminated the requirement of a judicial finding of an aggravating circumstance to impose an upper term and instead allowed trial courts more discretion to select a sentencing term from among the range of statutory sentences, then our state law would comply with federal constitutional requirements. The state Legislature began efforts to amend section 1170 along these lines, but when the Powell case was tried in February and early March 2007, that amendment had not yet been enacted. During the interim period between the *Cunningham* decision and the legislative response to it, some trial courts submitted some sentencing enhancement issues to juries for determination. This is what the trial court did in the case before us, and the jury found that F.J. had been a particularly vulnerable victim.

> On March 30, 2007-a few weeks after the Powell jury made this finding-the statutory response to *Cunningham* took effect. That amendment removed the prior law's preference for the midterm and gave a trial court broader discretion to impose whichever of the three statutory terms it found suitable. This amendment rectified the constitutional defect found in *Cunningham.*

> Powell was sentenced in March 2008, *after* the March 2007 amendment to section 1170 took effect. Thus, by the time of sentencing, the trial court had regained the authority to determine whether F.J. was particularly vulnerable within the meaning of our sentencing law, consistent with federal constitutional law. At sentencing, the trial court-after noting the jury's finding-itself found that F.J. was particularly vulnerable. This was one of three aggravating circumstances that it found to be true. It relied on these factors in aggravation when it imposed the upper base term for the principal offense of continuous child abuse.

*Powell*, 2010 WL 1006929, at *11-12 (footnotes omitted) (citations omitted).

The California Court of Appeals rejected Powell's ineffective assistance of trial counsel claim specifically because the record demonstrated "that the trial court relied on its own findings in aggravation—not those of the jury–when it exercised its discretion to impose the upper term for the principal offense of continuous child abuse." *Id.* at *12. Accordingly, the California Court of Appeals concluded that Powell could not show any prejudicial effect from his trial counsel's failure to object to the trial court's definition of "vulnerable" since the trial judge relied on its own finding of vulnerable and not that of the juries. As such, his claim for ineffective assistance of counsel failed because he could not meet one of the elements—prejudice—under the *Strickland* standard. *Id.*; *see also Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

2. Analysis

Under *Strickland*, to demonstrate ineffective assistance of counsel, Petitioner must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. at 687. A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* Petitioner must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An analysis that focuses "solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-

31

assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." (citing *Strickland*, 466 U.S. at 687)); *United States v. Cronic*, 466 U.S. 648, 656 (1984) ("The right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." (citations omitted)).  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either one of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

> *Strickland* and its progeny do not mandate that this Court act as a "Monday morning quarterback" in reviewing tactical decisions.  *See Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990).  Indeed, the Supreme Court admonished in *Strickland*:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

466 U.S. at 689 (citations omitted) (internal quotation marks omitted).

> In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra,* at 473, 127 S.Ct. 1933.  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

*Mirzayance*, 556 U.S. at 121.

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d)(1) standard.  *Id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

The Supreme Court, applying the "doubly deferential standard," has made clear that when adjudicating ineffective assistance of counsel claims in federal habeas proceedings, unlike the situation on direct review, focus is not on whether counsel's performance fell below the *Strickland* standard.  Rather, the focus is on whether the state-court decision holding that counsel was not ineffective constituted an "*unreasonable* application of federal law[,] [which] is different from an *incorrect* application of federal law."  *Harrington*, 131 S. Ct. at 785.

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Id.* at 786.

Here, the California Court of Appeals applied the *Strickland* standard and found that even if Powell's trial counsel had been ineffective for failing to request a more complete definition of "vulnerable," Powell could not show that he was prejudiced as a result since the trial court relied on its own finding that F.J. was "particularly vulnerable" and not the jury's conclusion.  As such, this Court cannot say that the decision of the California Court of Appeal was "contrary to, or

33

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 402-406; *Andrade*, 538 U.S. at 70-75 (explaining this standard).  In addition, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter*, this Court cannot find that the state court unreasonably applied the correct legal principle to the facts of the Powell's case within the scope of *Andrade-Williams-Landrigan-Richter*; i.e., the state appellate court decision was not more than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable.

Powell has failed to establish that counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that his defense was prejudiced, as required by *Strickland* and *Hill*.  Powell is not entitle to relief under his third ground.

## V.  CONCLUSION AND ORDER

Powell is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.  *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: May 4, 2012.

/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge
